# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Room 120, San Clemente Inn,<br>2600 Avenida President, San Clemente, California | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 8:20-MJ-00392 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. § 1704 | Posession of USPS Arrow Key |
| 18 U.S.C. § 1708 | Posession of Stolen Mail |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Loren J. Rofe
*Applicant's signature*

_____
US Postal Inspector Loren J. Rofe
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and State: <u>Santa Ana, CA</u>

Hon. Douglas F. McCormick, U.S. Magistate Judge
*Printed name and title*

AUSA: S. Tenley (714-338-2829)

## <u>AFFIDAVIT</u>

I, Loren Rofe, being duly sworn, declare and state as follows:

## I.  <u>INTRODUCTION</u>

1.   I am a Postal Inspector with the United States Postal Inspection Service ("USPIS") and have been so employed since March 2001.  I am currently assigned to the Los Angeles Division, Mail Theft Team located in Long Beach, California. The Mail Theft Team investigates postal-related crimes, including theft of United States mail, fraud, and related activity in connection with access devices that include credit cards and debit cards, identity theft, and unauthorized use of other persons' information for financial gain.  The Mail Theft Team also investigates crimes related to the use, theft, or counterfeiting of postal keys (referred to as "arrow keys") and locks.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7).  As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.   I have completed a sixteen-week, basic training course in Potomac, Maryland, which included training in the investigation of mail theft, identity theft, and crimes against postal property.  During my employment, I have investigated crimes involving mail theft, bank fraud, identity theft, credit card fraud, and the theft or counterfeiting of postal keys and locks.  I have interviewed suspects, victims, and witnesses

regarding mail theft, bank fraud, identity theft, and the theft
or counterfeiting of postal keys.  Based on my own mail theft
investigations and discussions with other Postal Inspectors, who
combined have over 20 years of experience, I have learned about
mail theft investigations and common mail theft and identity
theft practices.  Prior to being assigned to the Mail Theft
Team, I was assigned to the Prohibited Mailing Narcotics Team in
Los Angeles, California where my duties included investigating
narcotics violations involving the United States Mails.  I was
also previously employed as a Special Agent with the United
States Immigration and Naturalization Service from January 1996
to March 2001.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of an application
for a warrant to search a hotel room and vehicle associated with
JOHN GILBO ("GILBO"), who is suspected of possessing and using a
United States Postal Service ("USPS") arrow key to steal U.S.
Mail, in violation of 18 U.S.C. §§ 1704 (possession of a USPS
arrow key) and 1708 (possession of stolen mail).

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>PREMISES TO BE SEARCHED</u>

5.    The premises to be searched are described as follows:

a.    Room 120, San Clemente Inn, 2600 Avenida President, San Clemente, California (the "SUBJECT RESIDENCE"), as further described in Attachment A-1, which is incorporated fully herein by reference; and,

b.    2005 BMW X5 SUV, black in color, with California license plate NCORJBL (the "SUBJECT VEHICLE"), as further described in Attachment A-2, which is incorporated fully herein by reference.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    Investigation of GILBO's Possession of an Arrow Key and Theft of U.S. Mail**

6.    Based on my conversations with and information provided by USPS employees J. Sixx and P. Oviedo, my review of USPS reports, and my personal conversations with witnesses (including a mail theft victim referred to herein as "Resident-1"), I have learned the following:

a.    Resident-1 lives in an apartment within a mixed-use apartment/business complex located at 107 Avenida de la Estrella in San Clemente, California (the "apartment complex").

b.    On May 30, 2020, Resident-1 and several family members returned to the apartment complex at approximately 5:30 p.m.  As they walked into the apartment complex, they saw their neighbor, who Resident-1 knows as GILBO, at what USPS refers to

as a Neighborhood Delivery Collection Box Unit (the "Collection Box Unit"). A Collection Box Unit is a large mailbox containing several individual mailboxes each assigned to a specific tenant located within the complex. The Collection Box Unit associated with the apartment complex has sixteen individual mailboxes.

       c.   When Resident-1 saw GILBO at the Collection Box Unit, the right panel of the Collection Box Unit was open. Resident-1 noticed that there was a key in the lock typically used by the USPS Letter Carrier to open the Collection Box Unit. When Resident-1 asked GILBO what he was doing, GILBO said that he was fixing the panel. According to Resident-1, GILBO then immediately closed the panel, removed the key, and left.

       d.   Resident-1 recalled that he had previously learned from GILBO that GILBO was a former USPS employee.

       e.   Resident-1 later informed the property manager, Ed Zeng, about what he had seen. Zeng responded that he would have cameras installed that could capture events at the Collection Box Unit.

       f.   When I asked Resident-1 whether he noticed that he had been missing any mail, Resident-1 and his wife said they had not received vehicle registration tags that they had been expecting. Resident-1 said he had not experienced any other fraud in his financial accounts.

       g.   Resident-1 further stated that he never authorized GILBO to possess, retain, or use their mail. Resident-1 also never granted GILBO access to his individual mailbox.

7.     On June 10, 2020, I spoke with Ed Zeng, the property manager for the apartment complex.  Zeng told me the following:

a.     GILBO and Darnell Lorraine Pryor, who Zeng believes is GILBO's wife, moved into Apartment A within the apartment complex in November 2019.  The check used to pay the security deposit and first month's rent was returned for insufficient funds.  Thereafter, Zeng has been pursuing the legal process necessary to evict GILBO and Pryor from Apartment A.

b.     On or around June 4, 2020, after learning of Resident-1's observations of GILBO and that other tenants believed they were missing mail, Zeng installed surveillance cameras that covered the area of the Collection Box Unit.

c.     Zeng reviewed the surveillance footage and saw that on June 4 and June 5, 2020, GILBO used some sort of key to open the Collection Box Unit panels.

8.     I personally reviewed the same surveillance footage and observed the following:

a.     On June 4, 2020, at approximately 10:18 p.m., a male (who Zeng identified as GILBO) can be seen using a key to open the Collection Box Unit access panel, giving GILBO access to all individual mailboxes within the panel.  GILBO then removed what appears to be U.S. mail from the open mailboxes.

b.     On June 5, 2020, at approximately 8:58 p.m., GILBO approached the Collection Box Unit.  He used a key to open the entire access panel.  He looked inside the Collection Box

Unit, but did not remove anything.  He quickly closed the panel, removed the key, and left the area.

9.    Based on my training and experience, I know that the key used to access a Collection Box Unit is commonly referred to as an "arrow key."  An arrow key is a universal type key that is used by USPS letter carriers, in the process of delivering mail, to access items including, but not limited to, USPS blue collection boxes, apartment complex security gates, and commercial mail receptacles.  An arrow key may only be possessed by USPS employees.  Arrow keys, or counterfeit arrow keys, are used by mail thieves to gain access to a large number of mailboxes at one time.  I also know that mail thieves may also manufacture or purchase counterfeit arrow keys which also allow access to Collection Box Units.  I also know that if a device other than an arrow key (or counterfeit arrow key) was used to access the Collection Box Unit, it likely would have damaged the lock and prevented USPS employees from delivering mail.  Because there is no information suggesting the lock is damaged, I have concluded that either an arrow key or counterfeit arrow key was used by GILBO to access the Collection Box Unit.

10.    On June 10, 2020, I obtained California Department of Motor Vehicles ("DMV") records for GILBO.  I compared the DMV photograph of GILBO to the individual on the surveillance video.  GILBO appears to be the individual in the video using a key to access the Collection Box Unit and remove mail.

11.    On June 11, 2020, I researched USPS employment records and confirmed that GILBO is a former USPS employee.  He resigned

6

from USPS in 2003.  Based on my training and experience, I know
that during employment, USPS employees would have had access to
USPS arrow keys.  However, a USPS employee would not have been
authorized to retain an arrow key after his or her employment
ended.

      **B.   The SUBJECT RESIDENCE and SUBJECT VEHICLE**

      12.   On June 10, 2020, Zeng told me that he believed GILBO
was residing at the San Clemente Inn.  Zeng further said that,
although GILBO had access to Apartment A while the eviction
process was pending, Zeng did not believe GILBO was sleeping in
Apartment A.  Zeng also showed me a photograph of GILBO's
vehicle, a BMW X5 SUV (the SUBJECT VEHICLE), parked at the San
Clemente Inn.  I could see the California license plate number
of the SUBJECT VEHICLE in the picture: NCORJBL.

      13.   I thereafter conducted a vehicle registration check
for the SUBJECT VEHICLE.  The SUBJECT VEHICLE is registered to
GILBO.  The registration expired in 2018.

      14.   On June 12, 2020, I conducted surveillance at the San
Clemente Inn.  I saw the SUBJECT VEHICLE parked in a parking
spot reserved for guests.  Although the registration for the
SUBJECT VEHICLE had expired in 2018, I saw that the license
plate for the SUBJECT VEHICLE had a July 2020 registration tag.

      15.   On July 8, 2020, I spoke with a manager of the San
Clemente Inn.  The manager confirmed that GILBO and Pryor have
rented Room 120 within the San Clemente Inn (the SUBJECT
RESIDENCE).  GILBO and Pryor have currently reserved the SUBJECT
RESIDENCE until July 19, 2020.

**C.    Training and Experience Regarding Mail Theft and Possession of Arrow Keys**

16.    Based on my training and experience, and my consultation with other United States Postal Inspectors, I am aware that typical mail thieves operate as follows:

a.    Mail thieves steal mail in a variety of ways: breaking into panel mailboxes at apartment or condominium complexes, which allows the thieves access to numerous individual mailboxes at once; using stolen or counterfeit USPS arrow keys to open USPS collection or mailboxes; submitting fraudulent U.S. Postal Service "Change of Address" requests to divert mail from a victim's residence and forwarding it to a suspect address or "drop" location; jamming USPS collection boxes with paper, to allow someone to reach into the box; reaching into USPS collection boxes overflowing with U.S. Mail; "mailboxing," a process by which mail thieves drive through neighborhoods and steal outgoing and/or incoming U.S. Mail from residential mailboxes; and "fishing," which is using a homemade sticky device that is lowered into USPS collections boxes to extract U.S. Mail through the deposit slot.

b.    Mail thieves will steal U.S. Mail to obtain personal checks, money orders, and cash or other cash equivalents, originally completed and mailed by the true account holders as payment to the account holders' creditors.  Mail thieves often use items or information taken therefrom to commit bank fraud or other financial crimes.  Specifically, mail thieves may use the checks to gain financial information

including account numbers and account holders' names and addresses.  Often, mail thieves use this information to create counterfeit checks, which they make payable to themselves or members of the ring.  Mail thieves also may chemically "wash" the checks to remove handwritten information or alter the checks to make them payable to different persons or entities or in higher amounts than originally were written and then fraudulently cashing the checks.  Similarly, mail thieves also steal U.S. Mail to obtain USPS customers' credit cards, credit card statements, credit card convenience checks, and correspondence which contains USPS customers' personal or financial information.  The mail thieves use the information from the stolen U.S. Mail to conduct "account takeovers" in which they add their own names to the victims' accounts for the purposes of fraudulently ordering or purchasing merchandise or applying fraudulently for credit cards in the victims' names. Mail thieves also commonly use equipment to print counterfeit credit and identification cards, including equipment to create magnetic strips for credit cards, embossing machines to create credit cards, laser printers to create checks, and magnetic card readers to read and re-encode credit cards.

          c.    The proceeds generated from the mail theft and related fraud activities often are used to buy methamphetamine or other illegal drugs, which then are used to recruit additional individuals to facilitate the scheme.

          d.    Mail thieves often keep evidence, contraband, fruits, or instrumentalities of violations of their crimes,

including stolen mail, arrow keys, and counterfeit arrow keys, in a location that is private, secure, and easily accessible, such as a residence, vehicle, personal storage units, or inexpensive short-term rental units, such as motel rooms.  Mail thieves commonly store in their residence tools that assist in committing their crimes, including but not limited to: stolen U.S. Mail, personal checks and credit cards stolen from the U.S. Mail, notebooks listing USPS customers' personal information, materials for creating false identification cards, computer equipment, check washing chemicals, equipment to create magnetic strips for credit cards, embossing machines to create credit cards, laser printers to create checks, magnetic card readers to read and re-encode credit cards, tools used to gain access to buildings and/or breaking into panel mailboxes at apartment or condominium complexes, and materials for constructing "fishing" devices.  This allows mail thieves to comfortably sort through the stolen mail for valuable items such as checks, money orders, credit cards, credit card applications, and other mail containing personal identifying information.

e.    It is common practice for mail and identity thieves to use and maintain computers to track their fraudulent transactions.  These individuals often use computers to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ computers for purposes of, among other things, (1) applying online for fraudulent credit cards; (2) obtaining personal identification information for the

purpose of establishing or modifying fraudulent credit card accounts; (3) using fraudulently obtained credit cards to make purchases; and (4) keeping records of their crimes.

f.   Individuals who participate in mail and identity theft use digital devices to maintain telephone numbers of co-conspirators in order conduct their business, to communicate with co-conspirators, and to coordinate their activities.

**D.   Training and Experience on Digital Devices[1]**

17.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GILBO's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of GILBO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.  <u>ITEMS TO BE SEIZED</u>

21.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 18 U.S.C. §§ 1704 and 1708 and which is incorporated herein by reference, will be found at the SUBJECT PREMISES.

## VI. <u>CONCLUSION</u>

22.   For all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1704 and 1708, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT RESIDENCE and SUBJECT VEHICLE, as further described above and in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
July, 2020.


_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

15

## **ATTACHMENT A-1**

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is Room 120 at the San Clemente Inn, located 2600 Avenida Del Presidente, San Clemente, California (the "SUBJECT RESIDENCE").  The SUBJECT RESIDENCE is located in a three story hotel that is situated on the south side of Avenida Del Presidente.  The hotel is tan and green in color with a brown-red trim.  The hotel room doors are red.  The SUBJECT RESIDENCE is located on the northeast side of the first story of the hotel and has the numbers "120" painted in blue on a white background that is affixed to the door that faces north.

## **ATTACHMENT A-2**

<u>VEHICLE TO BE SEARCHED</u>

The vehicle to be searched is described as a 2005 BMW X5 SUV, black in color, with California license plate NCORJBL (the "SUBJECT VEHICLE").

ATTACHMENT B

I.   <u>ITEMS TO BE SEIZED</u>

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1704 (possession of a USPS arrow key) and 18 U.S.C. § 1708 (possession of stolen mail) (the "Subject Offenses"), namely:

a.   Arrow keys, counterfeit arrow keys, partially made arrow keys, or other tools, key, or devices used to access USPS mail receptacles.

b.   Photographs, records, or communications related to arrow keys, counterfeit arrow keys, partially made arrow keys, or other tools, keys, or devices used to access USPS mail receptacles.

c.   United States mail or mail matter, whether opened or unopened, that is addressed to any person other than residents of the SUBJECT RESIDENCE.

d.   Data, records, or information pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than residents of the SUBJECT RESIDENCE, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, and PIN numbers and passwords for financial institutions or internet service providers (collectively, "identity information").

e.   Data, records, or information reflecting or referencing purchases using unauthorized identity information, such as purchases of merchandise, securities, electronic currency, gift cards, and other items of value.

f.   Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts of persons other than residents of the SUBJECT RESIDENCE;

g.   Any documents or records containing personal identifying information for persons other than residents of the SUBJECT RESIDENCE, such as Social Security numbers, dates of birth, addresses, bank account numbers, driver's license numbers, and credit card numbers;

h.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and precious stones worth more than $1,000;

i.   Any documents or records, including receipts, invoices, bank statements, and credit card statements, evidencing the purchase of any products or services using altered, counterfeit, or fraudulent checks, access devices, or other monetary instruments;

j.   Any products, goods, or merchandise purchased with fraudulent checks, access devices, or other monetary instruments;

k.    Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

l.    Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the names of, any person identified as a resident of the SUBJECT RESIDENCE;

m.    Any tools or equipment, such as computers, printers, scanners, embossing machines, credit card readers or encoders, washing chemicals, or imprinting tools, used or intended to be used, to alter, counterfeit, or create fraudulent checks, access devices, or other monetary instruments;

n.    Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

o.    Indicia of occupancy, residency or ownership of the SUBJECT RESIDENCE and things described in the warrant, including, but not limited to: forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing (limited to 10 items).

p.    Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

q.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii.  records of or information about
Internet Protocol addresses used by the device;

    ix. records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

  3. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.   <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

       a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

       b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

       c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

       d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

       e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

       f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

       g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress JOHN GILBO's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of JOHN GILBO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature,

in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.